**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| United States of America, | ) | CR 11-00634-PHX-FJM |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Desiree L. Hernandez, | ) | |
| Defendant. | ) | |

The court has before it defendant's motion to suppress statements (doc. 29), the government's response (doc. 30), and defendant's reply (doc. 33).

**I**

On March 25, 2011 at approximately 10:00 p.m., defendant drove to the San Luis Port of Entry at the United States/Mexico border in her car. While she waited in line for a primary inspection, Border Protection Officer Steven Holman noticed a discrepancy in the undercarriage of defendant's car. Consequently, Officer Holman referred defendant to secondary inspection. After arriving in secondary inspection, defendant was questioned by Officer Holman. She told him that she had been in Mexico at a party since 5:00 p.m. Officer Holman escorted the defendant to the secondary waiting area.

The exact sequence of events after this point is unclear. Both parties agree that after defendant was escorted to secondary inspection, a narcotics dog alerted to her car, she was searched, and was questioned about the amount of cash she was carrying. They disagree as

to the order. The government claims that once defendant arrived in secondary inspection, Officer Holman asked defendant how much money she had with her. Defendant allegedly told him that she had more than $1,000, which had been given to her by her mother because her mother claimed her children on her mother's tax return. According to the government, Officer Holman then went outside to inspect the car. An inspection of the car using a density tester device revealed a high density reading for the center hump of the car. A narcotics detector dog alerted to the presence of narcotics in the same area. Officer Holman obtained supervisor approval to conduct a pat down search of defendant. This search, performed by two other officers, yielded about $1,200 in U.S. currency. The government states that at this point, defendant again mentioned that the money came from her mother, and also mentioned that she was unemployed. Under defendant's timeline of events, she was only questioned by Officer Holman about the source of the cash after her car was inspected using the density tester and the narcotics dog and after the pat down search was conducted.[1]

Defendant's car was then moved to a lift and the carpet and center console removed. Officer Holman was able to see a black package in a non-factory compartment through a hole in the car floor. Customs and Border Protection then contacted Homeland Security Investigations. At about 11:00 p.m., Special Agents Michael Chastain and Christian Murphy arrived at the port of entry. Officer Holman then broke open the hidden compartment above the car's exhaust pipe. The compartment contained eight packages that field-tested positive for methamphetamine and cocaine.

After the narcotics were found in defendant's car, Special Agents Chastain and Murphy took defendant to an interview room. Murphy began counting the money in defendant's possession. Chastain and Murphy asked defendant her name, address, and place of employment. In response, defendant stated that she was starting a job the next Monday

---

[1] For reasons discussed below, we need not resolve this factual disparity to rule on defendant's motion.

1  at the Sunset Community Health Center.² At this point <u>Miranda</u> warnings were given,
2  defendant invoked her rights, and questioning ceased.

3  Defendant moves to suppress the following statements: (1) statements that her mother
4  gave her the $1,200 in cash and (2) the statement that she was starting a job at Sunset
5  Community Health Center. Defendant argues that these statements were taken in violation
6  of <u>Miranda</u> and of her Fifth Amendment rights.

**II**

7  Defendant did not receive <u>Miranda</u> warnings prior to being questioned about the
8  money she was carrying. Thus, the issue before us is whether the failure to give warnings
9  warrants suppression of the statement. <u>Miranda</u> warnings are required before custodial
10 interrogation. <u>United States v. Bassignani</u>, 575 F.3d 879, 883 (9th Cir. 2009). Not all
11 detentions constitute custody, which is either a formal arrest or the degree of restraint on
12 movement associated with an arrest. A defendant is in custody if, under the totality of the
13 circumstances, a "reasonable innocent person" would "conclude that after brief questioning
14 he or she would not be free to leave." <u>Id.</u> (citation omitted). The test is objective; the
15 subjective views of the person being questioned and the police officer are irrelevant. <u>Id.</u> We
16 consider five factors to determine whether a person is in custody: "(1) the language used to
17 summon the individual; (2) the extent to which the defendant is confronted with evidence of
18 guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and
19 (5) the degree of pressure applied to detain the individual." <u>Id.</u> (citation omitted). These
20 factors, however, are not exhaustive. In this case, we must also consider that the questioning
21 of defendant occurred at the border. <u>See</u> <u>United States v. Butler</u>, 249 F.3d 1094, 1098 (9th
22 Cir. 2001) (noting that "special rules apply at the border"). When a person presents herself
23 for admission at the United States border, her "brief detention" by customs officials "is not
24 custody, even though such persons are not free to leave or to refuse to be searched." <u>Id.</u>

---

² When Special Agent Murphy contacted Sunset Health on March 29, 2011, he was advised that defendant had been interviewed but had not yet been offered a job.

Under defendant's timeline of events, she was escorted from her car to secondary inspection. While in secondary inspection, a narcotics dog alerted to the presence of narcotics in her car. Defendant was then subjected to a pat down search in the presence of several customs officers which revealed she was carrying $1,200 in cash. At this point, she was questioned about the amount of cash she was carrying. Defendant argues that when she was questioned about the money no reasonable person in her position would have felt free to leave. Defendant points to United States v. Whitehead, 200 F.3d 634 (9th Cir. 2000), arguing that it is factually indistinguishable from this case. In Whitehead, a narcotics dog alerted to defendant's car at secondary inspection. Defendant was then escorted to the secondary inspection office and frisked while his car was searched. Id. at 636. We do not find Whitehead controlling. There, the government conceded that the defendant was in custody at the time he was escorted to the secondary inspection office. Id. at 636 n.1. The court in Whitehead did not conduct any independent analysis as to whether the defendant was in custody for Miranda purposes.

Instead, we analyze the circumstances surrounding defendant's questioning (assuming that events unfolded as defendant describes) under the factors outlined in Bassignani, keeping in mind that the events unfolded at the United States border. First, defendant was required to submit to secondary inspection and a pat down search prior to questioning. She was not explicitly told that she was free to leave after the inspection was complete. However, this means little in the context of a border crossing. All people appearing at the border are subject to routine search of themselves and their effects. United States v. Montoya de Hernandez, 473 U.S. 531, 538, 105 S. Ct. 3304, 3309 (1985). Reasonable innocent people understand that they will be permitted to enter the United States and resume their travels after inspection is complete. Next, there is no indication that the defendant was confronted with evidence of guilt before she was asked about the amount of cash found during the pat down. She was not told about the narcotics dog alerting to her car prior to being questioned about the money, and the drugs were not discovered and removed from her car until after she was searched and questioned. The physical surroundings are also instructive. Here, defendant

was escorted to secondary inspection, an area generally open to the public. There is no evidence that she was handcuffed, brought to a holding cell, or a locked room for the pat down search. Next, the questioning was brief. Defendant was asked one question about the amount of cash she was carrying. Finally, defendant does not present any evidence that the customs officials applied pressure to either detain her or question her.

Moving defendant to the secondary inspection area while her car was searched does not, in itself, amount to custody. "[M]ere detention of a person in a border station's security office from which he or she is not free to leave, while a search of a vehicle occurs, is not 'custody' for these purposes." Butler, 249 F.3d at 1100. Defendant argues that the alert of the narcotics dog on her car prior to the questioning influences the determination of custody. Although the dog's alert might have prompted the pat down and resultant questioning, it is the defendant's physical circumstances - not the underlying reasons prompting her search - that are relevant to the determination of custody:

> the key fact was not that drugs had been found, but that the juvenile's physical circumstances had changed from sitting on a bench in an office to being locked in a cell. Although the discovery of the drugs prompted the agents to move the juvenile from the security office into a cell, it was <u>locking the juvenile into a cell</u>, not what prompted it, that marked the change in the juvenile's custody status.

Id. at 1100-01 (emphasis in original). Here, once defendant arrived in secondary inspection, her physical circumstances never changed prior to being questioned: she was not handcuffed, moved to a cell, or otherwise physically restrained. Similarly, that defendant was frisked prior to being questioned does not alter her custodial status. See United States v. Bravo, 295 F.3d 1002, 1011 (9th Cir. 2002) (escorting a person at the border to a security office and searching him does not turn a detention into a custodial arrest).

Considering all of the circumstances, we conclude that defendant was not in custody when she was questioned about the $1,200 she was carrying. She was detained for search at the border, and was asked one question after the search revealed she was carrying a significant amount of cash. Under these circumstances, a reasonable innocent person would have felt that she was free to leave after the search of her car, her person and brief

questioning about the amount of cash she was carrying was complete. Thus, because defendant was not in custody at the time she was questioned about the $1,200 in her possession, Miranda warnings were not required.[3]

### III

Defendant also moves to suppress her statement made to special agents Chastain and Murphy that she was starting a new job the next Monday. This statement was made in response to a question asking her place of employment. At this point, the cocaine and methamphetamine had already been discovered in her car and tested, and Chastain and Murphy had brought defendant to an interview room. The government does not dispute that at this point defendant was in custody for Miranda purposes. Instead, the government argues that defendant's statement is admissible because the statement was an answer to a standard custodial booking question.

Routine questions that obtain necessary biographical information to complete booking of a suspect do not require Miranda warnings, despite a person being in custody. Pennsylvania v. Muniz, 496 U.S. 582, 601, 110 S. Ct. 2638, 2650 (1990) (plurality opinion). This exception does not apply, however, if even routine booking questions are "reasonably likely to elicit an incriminating response in a particular situation." United States v. Mata-Abundiz, 717 F.2d 1277, 1280 (9th Cir. 1983). The relationship of the crime suspected to the question that is asked is "highly relevant." Id. Defendant argues that because the agents suspected her of importing drugs for money, and because she was found with $1,200 in cash, her employment status would be relevant to whether there was a legitimate source for the money and whether her financial situation gave her a motive to commit the crime. We are not persuaded that the relationship of defendant's place of employment to the suspected crime is highly relevant. Although the source of the money may be relevant to the alleged crime, that was not the question asked. Where defendant is employed, which was the question, is

---

[3]Our analysis is the same even if defendant was first questioned about the amount of cash she was carrying when she first arrived in secondary inspection, as the government claims.

not related to an element of the crime of importing drugs. And the government does not need to prove motive to secure a conviction. Under the circumstances, asking defendant her place of employment was not reasonably likely to elicit an incriminating response. Instead, it was a routine booking question for which Miranda warnings are not required.

**IV**

Defendant's statements about the amount of cash she was carrying and her employment at Sunset Community Health Center were made in response to questioning for which Miranda warnings were not required. Accordingly, there is no Fifth Amendment violation and her statements do not need to be suppressed.

**IT IS ORDERED DENYING** defendant's motion to suppress statements (doc. 29).

DATED this 19th day of January, 2012.

_Frederick J. Martone_
Frederick J. Martone
United States District Judge